[D.I. 60]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| JOSEPH P. ZAWADSKY, et al., | Civil No. 14-2293 (RBK/AMD) |
| Plaintiffs, | |
| v. | |
| BANKERS STANDARD INSURANCE COMPANY, | |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

In this action, Plaintiffs Joseph P. Zawadsky, Marilyn
M. Zawadsky and Carol Martinez, as Trustee for the Trusts Created
by Marilyn M. Zawadsky Grantor Retained Interest Trust, Dated
December 23, 1992 (hereinafter "Plaintiffs") seek insurance
coverage for damages to their Mantoloking, New Jersey home,[1] as
well as personal property damages sustained during Superstorm
Sandy. Defendant Bankers Standard Insurance Company (hereinafter
"Defendant") denies that there is any coverage for the loss under
the applicable insurance policy. In the motion presently before
the Court, Plaintiffs assert that Defendant engaged in a pattern

---

[1] Plaintiffs assert that Ms. Martinez "administers the Trusts
Created by Marilyn M. Zawadsky Grantor Retained Interest Trust,
Dated December 23, 1992. (See Complaint [D.I. 1] at ¶ 3.)

1

of concealment of a draft letter (hereinafter, the "Draft Partial Coverage Letter") that expressly stated that there were wind-related damages covered by the policy. Plaintiffs seek sanctions, including a ruling that as a matter of law there are wind-related damages. Defendant opposes the motion on a number of grounds. The Court has considered the submissions of the parties and held oral argument on the matter. For the reasons set forth herein, the Court grants Plaintiffs' motion for sanctions in part, and denies the motion without prejudice in part. The Court shall permit additional discovery as well as an award of reasonable attorneys' fees and costs. The Court shall also order Defendant to produce unredacted copies of emails as set forth herein.

Plaintiffs assert they are the insured under Policy No. 267-93-21 18H (hereinafter, "the Policy") issued by Defendant which insured the property located at 1033 Ocean Avenue in Mantoloking, New Jersey (hereinafter, "the Insured Dwelling") as well as the Zawadskys' personal property at the Insured Dwelling. (See Complaint [D.I. 1] at ¶¶ 10-13.) Plaintiffs allege that on October 29, 2012, the winds from Superstorm Sandy "blew out windows," "caused soffit boards to separate from the framing," and "caused the roof to detach and carried the roof several yards behind the Insured Dwelling." (See id. at ¶¶ 14-20.) As a result, Plaintiffs allege "[t]he wind damage resulted in a covered loss to the dwelling under the terms of the [P]olicy" and the wind "also

2

caused damage to the Insured Personal Property." (See id. at ¶¶ 22, 24.) Plaintiffs assert "[t]he property damage resulting from the wind damage occurred, or became inevitable, before the storm surge reached the Insured Dwelling." (See id. at ¶ 27.) Specifically, Plaintiffs allege that "[t]he Policy provides multiple coverages . . . including coverage for damage to the Insured Personal Property and coverage for damage to the Insured Dwelling" (see id. at ¶ 28), and that "[t]he extraordinary wind from Superstorm Sandy and resultant damage to the Insured Dwelling and Insured Personal Property constitute a covered loss under the terms of the Policy." (See id. at ¶ 38.) Plaintiffs also assert that they have complied with all Policy terms and that Defendant "is obligated under the Policy to pay [] Plaintiffs for the full amount of the damages attributable to wind damage." (See id. at ¶¶ 47-48.) Plaintiffs further maintain "[t]here are no conditions, exclusions or other provisions of the Policy that entitle Bankers to deny coverage to [] Plaintiffs." (See id. at ¶ 49.)

Defendant denies it is obligated to provide coverage to Plaintiffs for the damage sustained during Superstorm Sandy and has asserted a number of affirmative defenses. (See Answer [D.I. 13], ¶¶ 47-48.) Defendant asserts, inter alia, "the concurrent causation exclusion in the Policy bars Plaintiffs' claims in their entirety," and that the Policy's "weather conditions exclusion, coupled with the Water Exclusion bar coverage for the damage to

3

the structure and personal property." (See Defendant's Memorandum in Opposition (hereinafter, "Def.'s Opp'n") [D.I. 63] at 15-18.)

The issue before the Court is whether Defendant's late production of the Draft Partial Coverage Letter constitutes a basis for sanctions. Also before the Court is Plaintiffs' request to compel production of a number of emails related to the coverage letters that Defendant has withheld on the basis of attorney-client privilege.

The Court will set forth the facts relevant to the motion. Plaintiffs allege that on November 7, 2012, they "tendered the claim for coverage to" Defendant allegedly "seeking coverage for loss resulting from wind damage." (See Complaint [D.I. 1] at ¶¶ 50-51.) Defendant's first representative to inspect the Insured Property reported to Defendant in November 2012 that "'60-70% of the roof has been ripped off.'" (See Pls.' Memorandum in Support of Motion for Discovery Sanctions and Related Relief (hereinafter, "Pls.' Br.") [D.I. 60-1], 4; (see also [D.I. 60-10], at ZAW-BS-CF-0160.) At that time, Defendant's risk consultant stated that "[d]ue to the storm surge, the entire rear of the home has been damaged" and "[t]he back of the home has been lifted off its foundation and is now tilted over." (See Ex. 8 [D.I. 60-10], at ZAW-BS-CF-0160.) Plaintiffs allege that Corey Everett, the claims adjuster in charge of Plaintiffs' claim, thereafter retained LGI Forensic Engineering, P.C. (hereinafter, "LGI"), to "perform[] an

4

inspection" of the Insured Dwelling and to "identify wind vs. flood damages." (See Pls.' Br. [D.I. 60-1], 4 (quoting Ex. 9 [D.I. 60-11], at ZAW-BS-CW-0069).) Plaintiffs further assert that LGI, through Frank P. Villano, P.E., Senior Engineer, issued a report dated January 2, 2013 (hereinafter the "January 2, 2013 LGI report") that identified "wind damage to the roof, walls and siding, hurricane panels and windows, and soffits." (See id. at 7 (citing Ex. 3 [D.I. 60-5], at ZAW-BS-CF-0235-0236).) The January 2, 2013 LGI report also states that "[s]ubstantially high storm surge resulted in the collapse and transport of the dwelling" and that a "[r]eview of photographs of the dwelling taken immediately after the storm event confirm that the collapse of the structure was from storm surge and wave action from the Atlantic Ocean." (Ex. 3 [D.I. 60-5], at ZAW-BS-CF-0235.)

Plaintiffs allege that on January 15, 2013, Defendant notified Plaintiffs of its refusal to provide coverage of Plaintiffs' claim based on Defendant's determination that "the loss was caused by a storm surge." (See Complaint [D.I. 1] at ¶¶ 70-71; see also Ex. 3 [D.I. 60-5] (setting forth a copy of the January 15, 2013 letter) (hereinafter "Final Denial Letter").) The copy of the Final Denial Letter issued to Plaintiffs states in pertinent part:

> We will not be able to make payment for water damage caused by storm surge, flood or surface water due to the above mentioned exclusions.

5

> As the engineer noted in his report, the roof also sustained damage from wind, but only after its structural support failed due to the force of the storm surge. For that reason, we are unable to make payment for that damage, because your policy expressly excludes loss or damage in which flood or storm surge, or other excluded peril, is a contributing cause of the damage.

(See Ex. 3 [D.I. 60-5], at ZAW-BS-CF-0232.) Also attached to the January 15, 2013 letter was a copy of the January 2, 2013 LGI report. (See id. at ZAW-BS-CF-0234 to 0239.)

Plaintiffs assert that on May 13, 2013, after they retained an engineer to "investigate the loss," they "informed [Defendant] that [Plaintiffs' engineer's report] had established that the conclusions in the [] report [relied upon by Defendant] were unsupported by the facts." (See Complaint [D.I. 1] at ¶¶ 74-77.) Plaintiffs allege that despite Plaintiffs' letter of May 13, 2013, Defendant "refused to amend its coverage position and refused to pay or reimburse [] Plaintiffs for their covered losses," and that an additional demand for payment, made on September 20, 2013, had likewise been denied. (See id. at ¶¶ 84-87.)

Plaintiffs filed their complaint on April 9, 2014. Plaintiffs seek, inter alia, "a judicial determination of the parties' rights and obligations under the Policy" (see id. at ¶ 90), and allege Defendant's conduct constitutes a breach of contract, a breach of the duty of good faith and fair dealing, and a breach of the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1,

*et seq.* (See id. at ¶¶ 88-123.) On July 23, 2014, Plaintiffs served on Defendant their first set of interrogatories[2] and document requests[3] that specifically sought information and copies of internal communications about demands for coverage. Subsequently, Defendant responded that "all non-privileged documents pertaining to Plaintiffs' claim generated prior to the claim determination letter of January 15, 2013" were maintained in the claim file, and were being produced at Bates Nos. ZAW-BS-CF-0001-0472." (See Ex. 15 [D.I. 60-17], 3.) The production included the January 2, 2013 LGI report along with a certified copy of the Policy issued to Plaintiffs, at Bates Nos. BS-Cert.Pol.-0001-0202. (See generally id.) In addition, Defendant's document production included "at

---

[2] The interrogatories requested Defendant to identify "all communications . . . concerning the Incident or Plaintiffs' notices, requests, communications or demands for coverage in connection with the Incident . . . includ[ing] [] communications internal to [Defendant] and/or any Affiliate [and] communications between or among [Defendant] and any Affiliate." (See Ex. 14 [D.I. 60-16], 4.) This portion of the interrogatories does not include a definition for "Incident," but the definitions section included with the Plaintiffs' first set of document requests provides that "'Incident' means the casualty event, including without limitation wind damage that occurred on October 29, 2012." (See Ex. 16 [D.I. 60-18], 2.)

[3] Plaintiffs' First Set of Requests for Documents sought all documents related to Defendant's consideration of Plaintiffs' claim. (See, e.g., Ex. 16 [D.I. 60-18], 4 at Request No. 4 (requesting Defendant to produce "all documents concerning [Defendant's] or any Affiliate's handling of Plaintiffs' claims for coverage for the Incident").) Defendant objected to this request as it "calls for the production of documents protected by the attorney-client privilege and the work product doctrine, and further objected to the request "as overly broad and unduly burdensome." (See Ex. 17 [D.I. 60-19], 3.)

least three different copies of [a] Draft **Denial** Letter [], which was identified in deposition as a draft denial letter created by [Mark] McConnell." (See Declaration of Robert Gilbert (hereinafter, "Gilbert Declaration") [D.I. 60-2], ¶ 3.) Plaintiffs' counsel aver that "[o]ther than the missing signature, this document [was] identical to the text of the Final Denial Letter that was ultimately sent to the Zawadskys." (See id.; compare Ex. 2 [D.I. 60-4] with Ex. 3 [D.I. 60-5].) However, the Partial Draft Coverage Letter was not produced.

Plaintiffs' counsel avers that on February 10, 2015, Defendant "in response to a court order, produced inter alia approximately 31 unique email strings." (See Gilbert Declaration [D.I. 60-2], ¶ 4.) Plaintiffs' counsel avers that 23 of the email strings produced contained an email dated January 15, 2013, sent at 11:23 a.m. from Mr. McConnell to Eric Lindemann and Gregory Lawton (hereinafter, "the McConnell email"), and that in 22 of those email strings, the content of the email message was redacted. (See id.; see also Ex. C – Ex. X [D.I. 60-28 to 60-49] and Ex. B [D.I. 61] (filed under seal).) However, one of the copies of the McConnell email produced on February 10, 2015, was not redacted (hereinafter, "Document 009"). (See id. at ¶ 6; see also Ex. B [D.I. 61], 5 (filed under seal).) Upon reading Document 009, Plaintiffs' counsel avers that he "realized that Mr. McConnell had prepared an initial coverage determination letter that provided

coverage for wind damages" and that Defendant "had never produced such a document." (Gilbert Declaration [D.I. 60-2], ¶ 7.) Plaintiffs' counsel avers he "resolved to question Mr. Everett about the apparently missing letter when his deposition resumed on February 23, 2015." (See id.) Prior to the continuation of Mr. Everett's deposition, Defendant sent a letter to Plaintiffs stating that Document 009 was "a privileged communication which was intended to be redacted but was inadvertently produced unredacted," and that "[t]his inadvertent production was not intended to be a waiver," and requesting that the document be immediately returned. (See id. at ¶ 8; see also Ex. 21 [D.I. 60-23] (setting forth Defendant's Feb. 23, 2015 letter requesting the return of Document 009).) Plaintiffs' counsel avers that, pursuant to Federal Rule of Civil Procedure 26(b)(5), he "did not use [Document 009] during the Everett deposition[,]" but specifically inquired, by letter dated February 26, 2015, why the Draft Partial Coverage Letter had not been produced. (See Gilbert Declaration [D.I. 60-2], ¶ 8.) In the February 26, 2015 letter, Plaintiffs asserted that a number of the emails produced on February 10, 2015 indicate that attachments to the emails existed and that those attachments were not produced. (See Ex. 22 [D.I. 60-24].) Plaintiffs further asserted that communications between Mr. Lawton

and Mr. Lindemann[4] were not privileged because "there is no evidence that their participation in these claims communications involved anything other than ordinary claims-handling activity, and that "[u]nredacted copies should be immediately provided." (Id. at 2.) Plaintiffs sought a copy of the draft letter referenced in Document 009, as well as "an explanation of why [Document 009] ha[d] not previously been produced." (Id. at 3.)

By letter dated February 27, 2015, Defendant stated that it had produced "the five attachments which were identified in the McConnell email," that Defendant would "not be producing any communications between Mr. Lawton and Mr. Lindemannn . . . as those communications are protected from production by the attorney-client privilege[,]" and that Defendant's "demand that [Document 009], which was inadvertently produced and is subject to the attorney-client privilege, be returned stands." (Ex. 6 [D.I. 60-8].) At that same time, Defendant produced, for the <u>first time</u> the Draft Partial Coverage Letter addressed to the Zawadskys from Mr. McConnell dated January 15, 2013. The Draft Partial Coverage Letter included the following language:

> Your policy specifically excludes damage caused by storm surge, flood or surface water. Unfortunately, we will not be able to make any payment to you for the damage caused by storm surge, flood or surface water. <u>The wind-related damages are covered by your policy</u>.

---

[4] Mr. Lawton and Mr. Lindemann are attorneys and Defendant's in-house counsel. (Def.'s Opp'n [D.I. 63], 24.)

> Under separate cover, we will send you an estimate of the covered damages less your $500.00 deductible.

(See Ex. 1 [D.I. 60-3] (emphasis added).) Plaintiffs did not receive this document until February 27, 2015, and they were unable to question Mr. McConnell and Mr. Everett about this document as they had both already been deposed. (See Pls.' Br. [D.I. 60-1], 11, 17.) Plaintiffs seek sanctions under Federal Rule of Civil Procedure 37(b)(2) for the concealment of the Draft Partial Coverage Letter and what Plaintiffs characterize as a pattern of discovery abuses. Plaintiffs also seek the production of unredacted emails and claims notes created prior to the time on January 18, 2013 when the Final Coverage Denial was issued.

The Court first addresses the issue of whether the emails that accompanied the Partial Draft Coverage Letter are protected by the attorney-client privilege. In considering this issue, the Court notes that Defendant does not assert that the Partial Draft Coverage Letter is protected by the attorney-client privilege.

During discovery, Defendant produced a string of emails between Defendant's claim adjusters and its in-house counsel regarding Plaintiffs' claim coverage. Defendant redacted these communications asserting the attorney-client privilege as these

11

were communications with Defendant's in-house counsel.[5] Plaintiffs seek an order from the Court requiring Defendant to produce these emails in unredacted form. Plaintiffs assert that these communications occurred during the time period that Defendant was determining Plaintiffs' claim coverage. (Pls.' Br. [D.I. 60-1], 20.) The emails that have been redacted range in date from January 3, 2013 through January 18, 2013, which apparently occurred prior to the Final Denial Letter being mailed to Plaintiffs.[6] (See Plaintiffs' Appendix of Documents Redacted by Defendant [D.I. 60-26].) Therefore, Plaintiffs assert that Defendant's in-house counsel were acting principally as senior claim advisors, not as lawyers, and the emails should not be protected by the attorney-client privilege. (Pls.' Br. [D.I. 60-1], 19-20.)[7] Defendant counters that the emails are privileged communications[8] as they

---

[5] As noted *supra*, Defendant produced Document 009 - the email dated January 15, 2013 between its claim adjustor and in-house counsel without redaction and claims the production was inadvertent.

[6] Even though the Final Denial Letter is dated January 15, 2013, the letter apparently was not mailed to the Plaintiffs until sometime on or after January 18, 2013. (See Pls.' Br. [D.I. 60-1], 5.)

[7] Initially, Plaintiffs sought *in camera* review of the documents, see, e.g., (Proposed Order [D.I. 60-50]), but during the briefing requested production of the unredacted emails. (Reply Brief [D.I. 67], 10 n.6.)

[8] On September 29, 2015, Defendant sent a letter to the Court requesting the Court review the alleged privileged communications *in camera*. (See Letter [D.I. 94].) Defendant argued in its letter that its in-house lawyers are not adjusters and do not take part

constitute a request by Defendant's claim adjustors for the provision of legal services and guidance from Defendant's in-house counsel. (See Def.'s Opp'n [D.I. 63], 27.)

FED. R. EVID. 501 provides that "in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision." FED. R. EVID. 501. In this case, the basis for jurisdiction of this Court is diversity of the parties, and state law therefore supplies the rule of decision. Consequently, state law also governs the application of the attorney-client privilege. At oral argument, the parties stipulated that New Jersey law governs attorney-client privilege issues with respect to this motion.

The purpose of the attorney-client privilege is to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." Upjohn Co. v. United States, 449 U.S. 383, 389 (1981). The privilege thus "accords the shield of secrecy" to "confidential communications made within the context of the strict relation of attorney and client." United Jersey Bank v. Wolosoff, 483 A.2d 821, 826 (N.J. Super. Ct. App. Div. 1984). "The person asserting the privilege

---

in the adjustment process. (Id.) Plaintiffs objected to the subsequent submission on a number of grounds. (See Letter [D.I. 95].)

bears the burden of proving it applies to any given communication." Horon Holding Corp. v. McKenzie, 775 A.2d 111, 116 (N.J. Super. Ct. App. Div. 2001) (citations omitted). The privilege may also apply to communications between a corporation's employees and in-house counsel, so long as the communications are "made to the attorney in his professional capacity." Wolosoff, 483 A.2d at 825-26. However, "[c]ommunications which relate to business rather than legal matters do not fall within the protection of the privilege." Leonen v. Johns-Manville, 135 F.R.D. 94, 98 (D.N.J. 1990) (citations omitted). In deciding whether the attorney-client privilege protects a particular communication between a lawyer and a corporation, a court must determine whether the communication is "'designed to meet problems which can fairly be characterized as predominately legal.'" Id. at 99 (quoting Cuno, Inc. v. Pall Corp., 121 F.R.D. 198, 204 (E.D.N.Y. 1988)). In the insurance context, when courts assess whether the privilege attaches to an accident investigation file created by an attorney, courts focus on the capacity in which the attorney was conducting the investigation. See Miller v. J.B. Hunt Transport, Inc., 770 A.2d 1288, 1293 (N.J. Super. Ct. App. Div. 2001) (holding that defense counsel's "dominant purpose" or role was preparing for litigation). Here, the issue is whether in-house counsel was assisting in the claims-adjustment process. Plaintiffs only seek the documents dated prior

14

to or on January 18, 2013, prior to the issuance to Plaintiffs of the Final Denial Letter.

Defendant's argument that the communications of Mr. Lindemann and Mr. Lawton to other employees of Defendant are protected by the attorney-client privilege is just that – argument without any support by affidavit. Specifically, Defendant asserts that its in-house counsel are attorneys, not claim adjusters, and therefore the communications can only be regarding legal advice. (See Def.'s Opp'n [D.I. 63], 23-24.) However, Defendant has failed to support its conclusion with affidavits from its in-house counsel explaining their general role in the company regarding investigating claims or the specific role they played investigating Plaintiffs' claim. Moreover, Defendant has failed to provide reasons why or how these communications demonstrate that its in-house counsel was providing legal advice instead of merely performing tasks of claims adjustors. See, e.g., Indianapolis Airport Auth. v. Travelers Prop. Cas. Co. of America, No. 13-1316, 2014 WL 7360049, at *2 (S.D. Ind. Dec. 23, 2014) (reasoning that "[m]erely declaring that [] communications contained legal advice does not shield [a party] from production when the topics discussed are part of its ordinary course of business"); see also Country Life Ins. Co. v. St. Paul Surplus Lines Ins. Co., No. 03-1224, 2005 WL 3690565, at *5 (C.D. Ill. Jan. 31, 2005) (observing that "[i]n the insurance context, to the extent that an attorney acts

as a claims adjuster, claims process supervisor, or claims investigation monitor, and not as a legal advisor, the attorney-client privilege does not apply").

These redacted communications between Defendant's claim adjustors and in-house counsel [D.I. 60-26 and the exhibits attached thereto] occurred prior to the Final Denial Letter being mailed to Plaintiffs during the Defendant's investigation of the claim when the Defendant was considering the question of whether any damage sustained by the Plaintiffs was covered by the Policy. Therefore, the timing of these communications supports Plaintiffs' argument that Defendant's in-house counsel was part of the investigation of Plaintiffs' claim and not providing legal advice. The burden is on Defendant to appropriately support its application of the privilege at the time of the motion. Defendant has left it up to the Court to decipher these emails and determine whether in-house counsel is providing legal advice or acting as part of the claims investigation. Defendant has failed to demonstrate that the documents are protected by the attorney-client privilege. See, e.g., NetxG Networks, of NY, Inc. v. City of New York, No. 03-9672, 2005 WL 857433, at *2 (S.D.N.Y. Apr. 13, 2005) (noting that a party had failed to demonstrate that the attorney-client privilege attached to withheld communications where the party "submitted no affidavit explaining the context in which any of the communications were made" and relied "exclusively" on a privilege

log that provided "no evidence" that any communication "was created for the purpose of providing or obtaining legal rather than business advice, that it was intended to remain confidential, and that the privilege had not been waived"). Therefore, Defendant shall produce the unredacted copies of each of the documents attached to Plaintiffs' Appendix of Documents Redacted by Defendant [D.I. 60-26].

Having determined that Defendant has not demonstrated that the emails are protected under a claim of privilege, the Court need not address Plaintiffs' argument that even if the emails were privileged, Defendant's discovery warrants abrogation of the privilege.

The Court now turns to the issue of sanctions. Plaintiffs request sanctions under Federal Rule of Civil Procedure 37(b)(2) for Defendant's discovery abuses.  Plaintiffs assert Defendant "failed to produce the Draft Partial Coverage Letter in response to Plaintiffs' discovery demands or in response to numerous court orders" and that "Defendant's 30(b)(6) designee denied knowledge – under oath - of the letter's existence, despite the fact that on at least 22 occasions in Bankers' document production, the insurer redacted an email clearly showing that the letter existed." (Pls.' Br. [D.I. 60-1], 1-2.) Plaintiffs request that the Court find Defendant's alleged concealment of the Partial Draft Coverage Letter was an admission that Plaintiffs have incurred wind-related

losses and thus the only coverage issue for trial shall be the amount of such covered losses. (Id. at 3.) In addition, Plaintiffs request that the Court allow them to utilize Defendant's alleged concealment of the Partial Draft Coverage Letter as an adverse inference of bad faith. (Id.) In the alternative, Plaintiffs request that Defendant produce Mr. McConnell, Mr. Everett, and a properly prepared Rule 30(b)(6) witness for depositions relating to Plaintiffs' claims for breach of the duty of good faith and fair dealing, bad faith, and violations of the New Jersey Consumer Fraud Act. (Id.) Plaintiffs also requested during oral argument to question Mr. McConnell and Mr. Everett regarding the Partial Draft Coverage Letter [D.I. 60-3] and the reasons why it was not produced until after their depositions. Defendant has not raised any objection to producing Mr. McConnell and Mr. Everett for depositions.

If a party "fails to obey an order to provide or permit discovery . . . the court where the action is pending may issue further just orders[,]" which may include an order "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence[.]" FED. R. CIV. P. 37(b)(2)(A)(ii). Furthermore, under either Rule 37(b)(1) or Rule 37(c), the Court may order payment of attorney's fees and expenses. FED. R. CIV. P. 37(b)(2)(C); FED. R. CIV. P. 37(c)(1)(A). "Rule 37 sanctions are available to the

18

district court 'not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent[.]'" Wachtel v. Health Net, Inc., 239 F.R.D. 81, 84 (D.N.J. 2006) (quoting Nat'l Hockey League v. Metro. Hockey Club, 427 U.S. 639, 643 (1976)). "The Court also has inherent power to police litigant misconduct and impose sanctions on those who abuse the judicial process." Id. (citing Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991)). In imposing sanctions, the court "must ensure that there is an adequate factual predicate for flexing its substantial muscle under its inherent powers, and must also ensure that the sanction is tailored to address the harm identified." Republic of Philippines v. Westinghouse Elec. Corp., 43 F.3d 65, 74 (3d Cir. 1994).

In this case, Plaintiffs seek a ruling that there is wind coverage under the Policy as a matter of law. Specifically, Plaintiffs argue that Defendant has engaged in a pattern of discovery abuses in this case ranging from allegedly concealing the Draft Partial Coverage Letter, refusing to produce a privilege log, failing to produce claims emails showing attachments, failing to prepare Mr. Everett and Mr. McConnell to answer basic questions regarding the denial of Plaintiffs' insurance claim, and producing a string of emails that were altered, produced out of sequence, and not in the ordinary course of business. (Pls.' Br. [D.I. 60-

1], 14–15.) Plaintiffs contend that Defendant's conduct amounts to egregious discovery misconduct in order to conceal the "senior claims handlers' [Mr. McConnell and Mr. Everett] honest conclusion . . . that coverage should be granted for confirmed wind damage." (Id. at 16.)  In essence, Plaintiffs are requesting that the Court strike Defendant's defense that there is no coverage and enter judgment as a matter of law on that issue.

A dismissal sanction is reserved for extreme cases. Poulis v. State Farm Fire & Cas. Co., 747 F.2d 863, 867–68 (3d Cir. 1984) (citing Nat'l Hockey League, 427 U.S. at 643). Indeed, a dismissal of a claim or defense "must be a sanction of last, not first, resort." Hoxworth v. Blinder, Robinson & Co., 980 F.2d 912, 922 (3d Cir. 1992) (citations omitted). The moving party must demonstrate that the six factors set forth by the Third Circuit in Poulis, 747 F.2d at 868, favor imposition of such a sanction. Comdyne I, Inc. v. Corbin, 908 F.2d 1142, 1148 (3d Cir. 1990). These factors include:

> (1) The extent of the party's personal responsibility; (2) the prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery; (3) a history of dilatoriness; (4) whether the conduct of the party or the attorney was willful or in bad faith; (5) the effectiveness of sanctions other than dismissal, which entails an analysis of alternative sanctions; and (6) the meritoriousness of the claim or defense.

Poulis, 747 F.2d at 868 (emphasis omitted).

The Court finds that Defendant violated Federal Rule of Civil Procedure 37(b) in failing to identify and produce the Draft Partial Cover Letter in response to the Court's Orders to produce a privilege log [D.I. 26] and to produce all emails [D.I. 44]. Although Plaintiffs move under Federal Rule of Civil Procedure 37(b)(2), the Court finds that Defendant's failure to produce the Draft Partial Coverage Letter also violates Federal Rule of Civil Procedure 37(c)(1). Specifically, the document was required to be produced under Federal Rule of Civil Procedure 26(a) and the late production was not substantially justified; rather for the reasons set forth herein, Defendant's failure to produce the document was willful. Consequently, sanctions are appropriate and the Court now turns to the <u>Poulis</u> factors in light of Plaintiffs' request for a ruling that there is coverage as a matter of law.

The Court concludes the first <u>Poulis</u> factor – the extent of Defendant's personal responsibility – supports Plaintiffs' argument.  The Draft Partial Coverage Letter should have been produced in connection with Defendant's initial production and also in connection with the Court's January 21, 2015 Order (Order [D.I. 44], Jan. 21, 2015). The Draft Partial Coverage letter was not produced until February 2015 and only after Defendant inadvertently produced Document 009 – the unredacted McConnell email. The Draft Partial Coverage Letter was not included on the

privilege log[9] of the withheld documents produced by Defendant on November 18, 2014. (Ex. 18 [Doc. No. 60-20].) Rather, the privilege log had a large grouping of documents (ZAW-BS-CF-001732-35) referring to redactions or communications without specific delineation of the Draft Coverage Letter. (Id.) There were no electronic attachments from the originally harvested file material provided from Defendant and there were no electronic attachments from the supplemental production for Bates Nos. ZAW-BS-CF-001732-001735. (Ex. N [D.I. 64-3], ¶¶ 12-13.) Defendant did not include the attachments when it originally harvested the documents. Similarly, it was Defendant's counsel who apparently approved the redactions – made 22 times – of the McConnell email, wherein Mr. McConnell states "written as a partial denial." (See Ex. N [D.I. 63-4], ¶ 9.) There has been no satisfactory explanation as to why the email production has been truncated, although Mr. Lawton states he had "rearranged some of the e-mails in the string to better address the issues being raised on the e-mail." (Ex. P [D.I. 63-4], ¶ 7.) Mr. McConnell testified that he had no explanation why the emails were organized that way. (See Ex. 12 [D.I. 60-14], 72:22-75:2.) Mr. Everett testified that he "can't speak to how these several pages came to be together" with respect to

---

[9] The Court notes that the privilege log was served by Defendant after the Court Order dated October 29, 2014 [D.I. 26].

Defendant's production of the out-of-sequence dated emails. (See Ex. 10 [D.I. 60-12], 162:8-163:21.)

As to the second factor – the prejudice to Plaintiffs, the Court finds that this factor also warrants sanctions. Defendant's position with respect to prejudice of the late production is that Defendant has a strong case of no coverage and that the Draft Partial Coverage Letter quotes from the January 2, 2013 LGI report, which Plaintiffs had prior to any depositions. Defendant also asserts that Plaintiffs have had the opportunity to question Mr. Everett about the denial of coverage. Plaintiffs assert, however, that they have been prejudiced in that they were denied the opportunity to utilize the Draft Partial Coverage Letter in depositions and that any re-depositions would deprive Plaintiffs of an opportunity for "candid and unrehearsed testimony[.]" (Pls.' Br. [D.I. 60-1], 17.) The Court finds that this late production has caused prejudice to Plaintiffs. As noted by the District Court in Tarlton v. Cumberland Cty. Corr. Facility, "[d]efendants further claim that at this point they have answered all of plaintiff's discovery requests, and even though there was a delay in producing the cover sheets, now that plaintiff has them, there can be 'no harm, no foul.' Defendants are sadly mistaken. Their discovery violations are not harmless." 192 F.R.D. 165, 170 (D.N.J. 2000).

23

As to the third factor - a history of dilatoriness - the Court concludes that this factor favors an award of sanctions. The unclear manner in which the emails were produced, the failure to include the Draft Partial Coverage Letter on the privilege log, and the denial of the existence of the Draft Partial Coverage Letter despite the number of email chains redacting reference to the letter, all support a finding that Defendant has been dilatory. Indeed, Defendant claims that it produced a privilege log, but fails to address why the Draft Partial Coverage Letter was not identified on the log. Again, Defendant has failed to address why the attachments to emails were not included in the first production and why the emails from Mr. McConnell did not exist in the harvested emails of Mr. McConnell, Corey Everett, or Tony Guerriero. (Ex. N [D.I. 63-4], ¶ 21.) In addition, the dilatory conduct of Defendant continued despite the Court's January 21, 2015 Order that Defendant produce additional discovery by February 10, 2015. (Order [D.I. 44], Jan. 21, 2015.) The email strings produced on February 10, 2015 did not include all attachments despite reference to the attachment in the emails, and therefore, Defendant did not include in this production the Draft Partial Cover Letter. (See Ex. 6 [D.I. 60-8].)

The Court next addresses whether the conduct was willful or intentional. The fact that the withholding of the document relates to admission of coverage supports the Court's conclusion

24

that the failure to produce the Draft Partial Coverage Letter was willful. See Adams v. Trs. of N.J. Brewery Emps.' Pension Tr. Fund, 29 F.3d 863, 875 (3d. Cir. 1994) (observing in the context of discovery sanctions that willfulness and bad faith "involve[] intentional or self-serving behavior"). The pattern of non-disclosure with the number of redacted emails and the lack of producing attachments all support this finding. The electronic files representing the claim file of Defendant were submitted by Bankers to defense counsel, and consequently, Defendant harvested the electronic documents and emails first. (Ex. N. [D.I. 63-4], at ¶ 6.) Yet, the emails did not include the attachments. Moreover, Defendant's representative's testimony was evasive as to the existence of the Draft Partial Coverage Letter. Despite having received a copy of the Draft Partial Coverage Letter, Mr. Everett answered the question, "[d]o you have a memory one way or another whether a draft denial letter was created before the final one was issued?" (Ex. 11 [D.I. 60-13], 56:14-16) with the following testimony: "I do not." (Id. at 56:17.) In addition, there has never been any plausible explanation why it was not until the February 10, 2015 production that the emails reflected attachments. As previously noted, Defendant produced email strings in out-of-sequence date order. (See Ex. 4 [D.I. 60-6].)  In addition, the redaction of the emails certainly gave notice to Defendant of the existence of the Draft Partial Coverage Letter. Specifically,

25

counsel for Defendant approved the redactions to the documents identified to be produced in Defendant's supplemental production pursuant to the Court's October 29, 2014 Order which included the McConnell email which referenced the Draft Partial Coverage Letter. (Ex. N [D.I. 63-4], ¶ 9.)

Defendant argues that the failure to produce the attachment in February 2015 was inadvertent and that nonproduction of the Draft Partial Coverage Letter was the result of a number of production errors all as set forth in the certification of defense counsel's legal assistant Theresa Thompson. (Def.'s Opp'n [D.I. 63] at 16, 20.) Ms. Thompson certifies that the failure to produce the Draft Partial Coverage Letter with the February 10, 2015 Supplemental Production was "because it appeared to be a 'form' document and not responsive to the search parameters." (Ex. N [D.I. 63-4], ¶ 24.) In addition, Ms. Thompson certifies that "[a]ttachment 5 [(the Draft Partial Coverage Letter)] is an .rtf file (rich text format) and was inadvertently exported as an 'image'" (id. at ¶ 27), and that "[t]he export of [a]ttachment 5 in its image format was inadvertent" and that when she "printed in paper format the exported files to review" she had no way to know that the exportation of the 5th attachment to this email from the database was incorrect. (Id. at ¶ 33.) However, even if the Court were to accept that representation, the certification does not adequately address why there were no attachments in the initial

production. In fact, Ms. Thompson certifies that there were no electronic attachments from the originally harvested file material provided from Defendant and there were no electronic attachments from the supplemental production for Bates No. ZAW-BS-CF-001732-001735. (Id. at ¶¶ 12-13.) Similarly, in producing the Draft Partial Coverage Letter with the February 27, 2015 letter, defense counsel stated "the attachments identified in this supplemental production were not so identified in the original production and were not harvested by Bankers when the original gathering of documents was conducted." (Ex. 6 [D.I. 60-8].) In addition, there has been no justification for why the January 15, 2013 4:22:57 p.m. email from Mr. McConnell does not exist in the harvested emails of Mr. McConnell, Corey Everett or Tony Guerriero. (Ex. N [D.I. 63-4], at ¶ 21.)[10] The Court therefore finds for all of these reasons that Defendant engaged in a willful and intentional act to conceal the Draft Partial Coverage Letter.

The Court next addresses the Poulis factor of whether Defendant presents a meritoriousness defense. In addressing the meritoriousness of a pleading, courts generally consider whether "the allegations of the pleadings, if established at trial, would support recovery by plaintiff or would constitute a complete

---

[10] This version of the January 15, 2013 email of Mr. McConnell shows a time of 4:22:57 p.m. and lists attachments. The version of the email as Document 009 is timed 11:23 a.m. and shows no attachments. Defendant has not explained this discrepancy.

defense." <u>Poulis</u>, 747 F.2d at 869-70. A court need not, however, "balance both parties' claims and defenses" or "have a mini-trial before it can impose a default." <u>Hoxworth</u>, 980 F.2d at 922. Where "both sides' positions appear[] reasonable from the pleadings," the "meritoriousness factor" is "neutral and not dispositive" in the <u>Poulis</u> analysis. <u>See</u> <u>Curtis T. Bedwell & Sons, Inc. v. Int'l Fid. Ins. Co.</u>, 843 F.2d 683, 696 (3d Cir. 1988) (noting that "[t]here is no indication . . . that in order to meet the meritoriousness factor supporting dismissal in <u>Poulis</u>, the defense must be compelling and, at all events, one <u>Poulis</u> factor is not controlling"). Defendant has asserted a number of defenses to Plaintiffs' claim, including exclusions in the Policy. Both parties have expert reports to support their respective positions. At this time, the Court finds this factor neutral in the evaluation of sanctions.

The remaining <u>Poulis</u> factor is whether there are lesser sanctions available. Plaintiffs request that the Court conclude as a matter of law that Defendant has admitted that Plaintiffs have incurred wind-related damage and that the only coverage issue for trial is the amount of such loss. (Pls.' Br. [D.I. 60], 3.) Defendant asserts that such a sanction amounts to dismissal of Defendant's defenses and that such a harsh sanction is not warranted in this case. (Def.'s Opp'n [D.I. 63], 13-14.) Rather, Defendant asserts that a reasonable remedy for the late production

28

is for the Court to order Mr. McConnell and Mr. Everett to be re-deposed. (Id. at 21.) If the Court were to grant Plaintiffs' request, the Court would be striking the coverage defenses asserted by Defendant – including the defense that the concurrent and sequential language and flood exclusion preclude coverage. Although Defendant's conduct warrants sanctions, the Court finds that the prejudice to Plaintiffs may be addressed by reopening discovery and permitting inquiry into the issues surrounding the Draft Partial Coverage Letter. "[D]ismissal with prejudice is only appropriate in limited circumstances and doubts should be resolved in favor of reaching a decision on the merits." Emerson v. Thiel Coll., 296 F.3d 184, 190 (3d Cir. 2002). Moreover, this finding is without prejudice to Plaintiffs' right to renew the motion following the depositions in the event that Plaintiffs can demonstrate additional prejudice and/or additional facts that would support entry of the extreme sanction Plaintiffs seek here. Plaintiffs may also depose Defendant's witnesses again on the issues surrounding the withholding of the Draft Partial Coverage Letter, as well as any issues related to the production of the unredacted emails. Defendant shall be required to pay all of Plaintiffs' reasonable expenses, including reasonable attorneys' fees and costs, incurred in connection with the additional depositions. The number of depositions and location shall be addressed at the next scheduling conference. In addition, the Court

awards Plaintiffs reasonable attorneys' fees and costs incurred in connection with the filing of this motion and incurred in connection with obtaining the Draft Partial Coverage Letter. Discovery violations that require the parties to reopen or reexamine areas of discovery have been held to be prejudicial and sufficient to require sanctions. See Cody v. Phil's Towing Co., 247 F. Supp. 2d 688, 696 (W.D. Pa. 2002) (holding that defendant shall "pay for any additional discovery costs and attorney's fees incurred as a result of having to reopen or reexamine areas of discovery further placed at issue" because of defendant's failure to supplement interrogatory responses). These sanctions are appropriate under Rule 37(b).

In conclusion, Defendant's failure to produce a highly probative draft coverage letter needlessly complicated this matter. The manner of the production of the emails and the still unexplained failure to produce the attachments in earlier productions created delay in this action and resulted in additional costs to Plaintiffs. Most importantly, the Draft Partial Coverage Letter – despite Defendant's assertion to the contrary – is an admission by one claims adjuster that there is coverage under the Policy. The fact that a more senior adjuster trumped that position and directed a flat denial of coverage be issued does not erase this conclusion. Additionally, the concealment of that conclusion – that admission – bespeaks of purposeful conduct that may, after

30

the depositions are conducted, warrant additional sanctions. As noted by Plaintiffs, if it were not for the inadvertent production by Defendant on February 2, 2015 of the unredacted email, Plaintiffs would still not have the Draft Partial Coverage Letter.

Consequently, for the reasons set forth herein, and for good cause shown:

IT IS on this 30th of December 2015,

**ORDERED** that Plaintiffs' motion seeking discovery sanctions and related relief [D.I. 60], shall be, and is hereby, **GRANTED IN PART** and **DENIED WITHOUT PREJUDICE IN PART**; and it is further

**ORDERED** that Plaintiffs' motion to the extent they seek additional discovery is **GRANTED**; and it is further

**ORDERED** that Plaintiffs shall be permitted to conduct additional depositions, the extent of which shall be addressed at the next conference, and Defendant shall pay Plaintiffs' reasonable expenses, including reasonable attorneys' fees and costs in connection with reopening discovery, including all reasonable costs and attorneys' fees for the depositions; and it is further

**ORDERED** that Plaintiffs' motion [D.I. 60] to the extent they seek a default judgment pursuant to Federal Rule of Civil Procedure 37(b)(2) shall be, and is hereby, **DENIED** without prejudice; and it is further

31

**ORDERED** that Plaintiffs' motion to the extent they seek to compel production of the redacted emails is **GRANTED** and Defendant shall produce by January 15, 2016, unredacted copies of each of the documents identified in Plaintiffs' Appendix of Documents Redacted by Defendant [D.I. 60-26]; and it is further

**ORDERED** that Defendant Bankers Standard Insurance Company shall pay Plaintiffs' reasonable expenses, including reasonable attorneys' fees and costs in connection with the filing of the sanction motion [D.I. 60], and for time incurred in obtaining the Draft Partial Coverage Letter; and it is further

**ORDERED** that the parties shall appear for an in-person conference on **January 21, 2016 at 1:00 P.M.** in Courtroom 3B at which time the Court will address the scope and schedule of discovery and a schedule for submission of the application for attorneys' fees and costs.


s/ Ann Marie Donio
ANN MARIE DONIO
UNITED STATES MAGISTRATE JUDGE


cc: Hon. Robert B. Kugler